IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 8, 2013

**IN RE: CADINCE N.S., ET AL.**

**Appeal from the Juvenile Court for Hamblen County**
**No. 15315J, 15316J, 16735J     Mindy Norton Seals, Judge**

**No. E2012-02737-COA-R3-PT-FILED-APRIL 26, 2013**

The State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Nicholas K.S. ("Father")[1] to the minor children, Brooklyn J.S., Bailey L.S., and Cadince N.S. (collectively "the Children"). After a trial the Juvenile Court terminated Father's parental rights to the Children after finding and holding, *inter alia*, that clear and convincing evidence had been proven of grounds to terminate pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv), and that the termination was in the Children's best interest. Father appeals the termination of his parental rights to this Court. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Russell Veldman, Chuckey, Tennessee, for the appellant, Nicholas K.S.

Robert E. Cooper, Jr., Attorney General and Reporter; and Alexander S. Rieger, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

---

[1]The petition also sought to terminate the parental rights of Candice D.S. ("Mother"). Mother surrendered her parental rights to the Children prior to trial, and Mother is not involved in this appeal.

# OPINION

## Background

Father and Mother were married at the time that the Children were born. The Children were taken into State custody in July of 2011 after it was discovered that Mother was using illegal drugs while the Children were present. Father was incarcerated in federal prison at that time. The Children were found dependent and neglected in a hearing held in February of 2012. DCS filed its petition in March of 2012 seeking to terminate Father's and Mother's parental rights. Mother surrendered her parental rights to the Children in September of 2012 and never revoked the surrender. The case against Father was tried in December of 2012. At trial, Father, who still was in federal prison, testified by telephone.

Courtney Sweet, the DCS caseworker initially assigned to the Children's case, testified at trial. Ms. Sweet remained the caseworker through the filing of the petition to terminate. She ceased being the caseworker when the case was transferred to Sevier County in May of 2012.

Ms. Sweet testified that at the time the Children came into custody Father was incarcerated in federal prison in Leavenworth, Kansas after being convicted and sentenced for conspiracy to possess with intent to distribute cocaine and marijuana. Father had been sentenced to 84 months. Ms. Sweet was asked about how the drugs and criminal activity affected the Children, and she stated: "It's hard on them. Especially in this case it's been hard on the girls, because they haven't got to see their dad. They have to do phone calls and write letters and draw pictures. So it's very hard. It's been very hard on them."

Ms. Sweet communicated with Father while she was the Children's caseworker. She stated: "We spoke often. He called me several times. He even set up an email account. We spoke through email. We spoke through lots of letters. We communicated a lot during this time of the case." When asked if her relationship with Father was a positive one, Ms. Sweet stated:

> I would say so in the beginning it was. More towards the end, before I left the case, when he found out we were going to file for termination, there was a little frustration and anger. He would apologize if he would get very angry with me. But all and all, I felt that we had a good caseworker and client relationship.

Father sent a letter to Ms. Sweet in January of 2012, which stated "that he was recently in the hole because he had beat up a child molester."

Ms. Sweet was asked how the Children are doing in foster care, and she stated: "They did good. To start with, they had some behavioral problems, and they got into therapy. They go to therapy once a month. But other than that, they are doing good now." The Children "interact well" with the foster parents and "act like [the foster parents] are their grandparents." Ms. Sweet testified that the Children are stable and well cared for in the foster home.

Ms. Sweet was asked if the foster parents had expressed a desire to adopt the Children, and she stated:

[The foster mother] did if the option came available. She has been a foster parent for a long period of time. If they are able to go home with their parents, then she is a big supporter of that.

If she were to be able to adopt them, she is still a big support [sic] in trying to let parents have contact with those children.

Ms. Sweet was asked if the Children know Father, and she stated:

They know of him. They say that they don't remember him; I think it could be because of their age. But they do like to talk to him on the phone, just to say hi and I love you, and color pictures to him.… They color the pictures, they give them to me, and then I send them to him. And then he also sends stuff back for them and I give them to them.… Yes, he has made several things for them, necklaces, stuffed dogs. He colors pictures for them. Writes them letters.

When asked if it would be in the Children's best interest to have Father's parental rights terminated, Ms. Sweet stated:

Yes, so they could be adopted. So they could have permanency. They question every day, are we - - especially when I had the case - - are we going to have to leave? You know, where are we going to go? Do we get to stay with you, nanna? Do we have to go back with mom or dad when they were doing stuff they weren't supposed to? They do remember what happened, the trauma part of it.… They have mentioned about how their house was burned down. They state their dad burned their house down. They have mentioned how they witnessed their mom shoot up drugs.

When they found out the foster parent had some medical conditions, they thought she was shooting up drugs. They get very concerned. Anything that has to do with needles or medicine, or anything, they are very traumatized by that.

Ms. Sweet was asked if Father ever had expressed a desire to give up the Children, and she stated:

He has never. He wants - - he feels that he should be able to get his kids. He feels that he has done nothing wrong. He knows that he has made bad choices, but he feels that he should get the right to be able to have his children.

He has complimented the foster mom, over and over again, in letters to her. He writes her letters as well, to her and to me, in letters, that he is appreciative of her, and he can tell a difference in his children.

Jody Lynn Dalton became the Children's DCS caseworker at the end of May of 2012, and remained the caseworker until the end of September of 2012. Ms. Dalton testified at trial and was asked if she had contact with Father. She stated:

I did. We had contact via mail. He would send letters to me, as well as to the foster home, and letters to the girls. And then I would send letters to him back. I would also send some pictures that the girls had drawn, some photos and schoolwork and things like that.

Father wrote a letter to Ms. Dalton telling her he had been in a fight and had been "in the hole." Ms. Dalton's understanding is that this fight affected Father's release date.

Ms. Dalton testified that she spoke with Father's prison case manager to see if Father could obtain services in prison. She explained:

I spoke to his case manager on the telephone and asked what types of programs were available there at the prison. It being federal prison, I assumed there were some type of programs.

And I asked the case manager if they had parenting and anger management and those types of programs. And he said yes. And I asked him if [Father] had been able to participate in those programs, and he said no. And I said, Well, why not? Is there a fee or something of that nature? And he said,

no, you had to be having appropriate behavior in order to participate in those programs, and that [Father] had not had appropriate behavior.

He wouldn't give me the details. But at that time that I spoke with him, which I believe it was at the beginning of September, 2012, he said that [Father] was currently in the hole at that time, but he wouldn't tell me why.

Ms. Dalton's understanding is that although being in the hole involves being segregated from the general prison population, the prison case manager told her that the prisoner still could receive and send letters.

Ms. Dalton visited the Children in the foster home and found the foster home to be appropriate. She testified that she believes it is in the Children's best interest to be adopted. Ms. Dalton testified that the foster mother has a box where the Children keep and save Father's letters after they look at them and read them, and that the Children enjoy getting letters, cards, and gifts from Father. Ms. Dalton stated:

They enjoy getting the letters. And when I asked them when is the last time that they saw their father, they told me that they have never met him, that they only saw his photo. So that's, I guess, how long it's been since they have seen him and had some interaction with him.

So that does concern me. But they do enjoy getting the letters, and they were happy to give me some schoolwork to send to him as well.

Ms. Dalton testified that Mother named another man as the potential biological father of Cadince and stated that this man was in jail. Heidi Huenergarde, who has been the Children's DCS caseworker since September of 2012, testified that she met with the alleged biological father of Cadince, and that he formally waived his rights, if any, to Cadince.

Ms. Huenergarde testified that she also has been in contact with Father. She testified that Father told her he expects to be released in May of 2013. When asked if Father has continued to have contact with the Children, Ms. Huenergarde stated: "He has. He has continued phone calls. And the one letter he sent me included some cards for the children that I passed on to the children."

Ms. Huenergarde was asked when Father could regain custody of the Children if his parental rights were not terminated, and she stated:

From what I understand, when he - - and if he is released May of 2013, there will be some house arrest or - - house arrest - - I'm sorry - - a halfway house stay for [Father] of approximately four to six months.

I am not sure, and he wasn't sure, if it would be in Kansas, or if it would be in, Texas where the crime originally had happened, or where exactly that would take place at.

After that, he would be on parol for four or five years. And I am, again, not sure if he can leave the state of Kansas, or the state of Texas, in order to come to Tennessee to even try to regain or have contact with his children.

So there is a strong possibility - - and I don't have all of the exact answers from him, because I don't believe he actually knows them either, but that he would be coming to Tennessee in order to unify or be a father to the children at any time soon.

The Children have been in foster care for 17 months and have been with the same foster family the entire time. Ms. Huenergarde was asked her assessment of the foster placement, and she stated:

It's very appropriate. The children are very bonded with the foster parents. Brooklyn and Bailey, the two older girls, have actually used the foster mom's last name as their last name.

When I asked them to send a picture - - draw a picture of a family, what family means to them, so I can send it on to the father, because he likes getting pictures from the kids, Brooklyn took the time to draw a new family, an old family, and a heart, and she wrote her name as Brooklyn [foster parent's name].

And in the new family she had the foster parents, their children, their grandchildren. And then, in the old family, she had [Father] and the mother, and some aunts and uncles, in that picture.

Bailey also drew a picture of her family, which was the foster parents, the relatives of the foster parent. And nowhere in her picture was [Father], in that drawing.

And then Cadince drew some stick figures. And when I asked her to label them, and I would write the names on them, she had said, "Nanna," which is what she calls the foster mom, the foster father, and some other children, neighborhood children and stuff, in the home.

So the children very much want to be adopted. And actually, just as the children were leaving here this morning from the perm plan, Brooklyn hollered out to both myself and to the foster mom, "Tell the Judge we want to be adopted."

Ms. Huenergarde believes it is in the Children's best interest to be adopted. She has spoken with the Children's therapist who reports that the Children have talked about Mother but not about Father, that the Children are very bonded with the foster family, and that the Children report they are happy in the foster home, feel safe there, and want to stay there and be adopted. The therapist is ready to discharge the oldest and the youngest of the Children and continue therapy with only the middle child for a little longer, but has decided to wait before discharging any of the Children pending the outcome of the trial to be sure the Children are okay with permanency before closing the case.

Ms. Huenergarde was asked that if Father were not incarcerated would he be an inappropriate parent, and she stated:

I believe, from the history, is that he wasn't very much - - he wasn't involved as much with the children to begin with. In regards to [Mother], there was some domestic violence between the two. He did have a charge in 2007 with a DUI, and some speeding, and those types of things, here in Hamblen County.

But I don't know how he parented. I never talked to the mother about, you know, how was he as a father. I didn't have, really, interaction with the mother, because when I took the case over she had already surrendered and was no longer a part of the plan.

Ms. Huenergarde testified that she visited the Children one Tuesday morning after the Children had spoken with Father on the telephone on Monday night, and she stated:

I do take the time to talk to the children individually, alone and away from the foster parents, et cetera. And when I talked with Brooklyn, who is the oldest, I asked her: how are your phone calls with dad? And she said, Oh, they are fine. And I said, Well, what did you guys talk about? She said, Nothing. I said, Well, tell me what conversation is like between you and your dad. And

she is like, I don't know. I get on the phone, I say hi, what are you doing, I love you, and then I give the phone to Bailey.

So then, when I would talk to Bailey, the same question, she would say, Well, I don't know what to say to him. And I was like, Well, do you ask him like what he is doing, how things are going? And she is like, I just say hi, and then I hand the phone back to "Nanna," which is what they call [the foster mother].

And then, when I spoke with the foster mom, she said that's pretty much how conversations go. They are short. Most of the conversations are between the foster mom and [Father].

But the conversations with the children and [Father] are very short, and just - - you know, there is no lengthy conversing about much of anything.

When Ms. Huenergarde took over the case she was under the impression that Father planned to surrender his rights to the Children. She stated:

When he had spoken with the foster mom he was under the impression that the foster mom would continue to allow the phone contacts, the letters, the cards.

And even when he were to get out of prison, if it were that he were able to come to Tennessee, that they would have a face-to-face meeting, she was agreeing to that, which I told [Father], is very rare, when we have foster parents who adopt, that they want - - that they allow that kind of communication, that much communication and contact between the birth parent and the children, so he should be very fortunate that she would be willing to do that. And that is when he informed me that I don't plan to surrender. Surrendering is for - - he didn't exactly say wimps, but he said that he couldn't understand how any parent could ever surrender their rights to a child. He would never. He is going to go out fighting for these kids.

And I, again, encouraged him that surrendering, in his case, would probably be the best, because this foster mom would allow, and would continue to allow, the same contact he has now with the children; that would not stop. And with a termination, that would stop.

Ms. Huenergarde testified that during his incarceration Father has earned his GED, completed a 40-hour career employment workshop, completed a program for healthy

lifestyles, completed a program in parenting education, completed a freedom from drug education program, and has become a certified production technician.

Linda S. ("the Foster Mom") is the Children's foster mother. She testified that the Children have done well in her home. The Foster Mom and her husband have fostered other children in the past. The Foster Mom testified that she and her husband want to adopt the Children. She explained that she has two biological children and that she has raised twelve children. Two of the Foster Mom's grandsons stay with the Foster Mom "most of the time." These children are eight and eleven years old, and they call the Children their sisters.

The Foster Mom testified that during the time the Children have been in her home:

Bailey has some issues. Any time that she visits with any of the family, or especially with mom, it sets her back for a couple of weeks…. She has anger. And she'll say, Well, mom wouldn't care, so I don't have to go to my room on time out, because momma doesn't care. So everything reverts back to mom right after she has seen her.

And the baby, she wakes up for about three or four nights after the visit. She wakes up every night and comes and crawls in my room.

The Foster Mom was asked what type of contact Father has had with the Children, and she stated:

He writes just about every other week, and he sends them a card and writes them a little note in it and usually makes something, like a little bracelet or a necklace or something.

And they enjoy receiving stuff from him. But their actual phone conversations - - they have not seen him - - but their actual phone conversation is about the same every week; I think because they don't have a lot to talk about. Especially the baby, she hasn't got on the phone the last two times.

And the second, Bailey, the middle girl, she just - - sometimes she will and sometimes she won't. And I think just that the conversation is always the same, because there is not a lot in common. They don't have much to talk about.

When asked about her telephone conversations with Father, the Foster Mom stated:

> Their conversation is usually about the same. How you doing? You doing good in school? Did you get what I sent you? And then I probably talk to him as much as they do. They get done pretty quick after the general questions are discussed.

> And I let him know what's going on. For instance, Brooklyn, which is his eldest, she got her first love note. So I told him about it. And I made a copy of it, so I could send it to him with some of their paperwork.

By their own choice the Children have been using the Foster Mom's last name as their own for approximately two months. The Foster Mom testified:

> And their teacher even called. Two of them - - the two of them - - there is two teachers in each room. And the oldest one, her teacher and teacher's aide, had called and asked me if it way okay, because she had started putting her name as [foster mother's last name], so - -

The Foster Mom testified that she thinks it would be good for the Children to continue to have contact with Father and agreed that she would be willing to continue to allow this as long as Father was on the straight and narrow. The Foster Mom testified that she does not foresee a problem with Father continuing to have the same type of contact with the Children that he has been having "as long as he is not high or drinking or - - … So as long as everything is okay I have no problem with it." She agreed it would break her heart to have to cut off all contact between Father and the Children. When asked if it would break the Children's hearts, the Foster Mom stated: "The oldest one, definitely. And the second one? It would bother her. I think that they enjoy his - - him better, the conversation, than they do with their mother." When asked if Brooklyn, the oldest child, would recover if her heart were broken by not having contact with Father, the Foster Mom stated: "Yes."

Father testified that he still is married to Mother. Father is the biological father of the two older of the Children. Father testified: "I am pretty sure I am the father of the youngest [Cadince].… I thought I was." He stated: "Well, I got incarcerated, and I was out for a little bit, right at the time she was conceived."

Father testified that his projected release date is in November of 2013 and stated he has "six months of halfway house coming that was down here in March of 2013." Father's original release date was extended for disciplinary reasons in connection with the fight Ms. Sweet testified about.

-10-

Father testified that he "enrolled in the drug program [in prison] because of my past drug use, and I was trying to get away from that, you know. And just for the record, those classes were in Beaumont, Texas, where Beaumont is a federal prison also." Father testified that he is enrolled in two programs to earn college credit, one is in hotel restaurant management and the other in custodial maintenance, industrial hygiene. He testified he also took an anger management program.

Father testified that when he gets out of the halfway house: "I am going to Texas." He plans to make his home in Texas. When asked about his plans for the Children, Father stated: "My plans with the girls, if I could have them back, would be just to raise them and try to give them a life that I haven't been able to give them so far."

Father was asked about the testimony from the caseworkers and the Foster Mom about the Children being settled in the foster home and asked if it would be detrimental to the Children to be removed from the foster home, and he stated:

> Sure. I mean, I am pretty sure whatever home they were in - - you know, if they stayed with me for two weeks, they would also want to stay with me forever. If they stayed with you for a little while, they would want to stay with you also. You know, they are little girls.

Father was asked about the domestic violence between him and Mother and if that occurred while the Children were at home or in front of the Children, and he stated: "Not right in front of them, no. But, I mean, the girls were always home. And I was always - - you know, [Mother] was always a housewife, you know, and I always worked and came home every day, and I am sure any arguments we had would have been around the children."

At the close of trial, the Children's guardian ad litem recommended that the Children be adopted by the foster parents and stated: "I think the foster mother wants to continue a relationship with the biological parents, and the girls, but to see them have to go through many many more months, without having permanency, is absolutely not in their best interest."

After trial the Juvenile Court entered its detailed judgment on December 19, 2012 finding and holding, *inter alia*:

> Mother previously surrendered her rights to all three children on September 5, 2012. Father is incarcerated in a federal penal facility in Leavenworth, Kansas. He was represented at the hearing by Russell Veldman, Esq., and father participated by telephone. The record will show that the court

asked father after each witness testified if he wished to speak privately to his attorney, and if he said, "Yes," that he was permitted to speak with his attorney. Amy Smith, Esq., appeared as the attorney for DCS, and Lauren Carroll, Esq., was present as the Guardian *ad Litem*.

* * *

There is a question as to whether [Father] is the biological father of Cadince. All three children's birth certificates are attached to Exhibit 1, and they show that [Father] is the father. However, mother named [another man] as the father of Cadince. [This other man] signed a Waiver of Interest and Notice.

The Petition to Terminate Parental Rights states one ground for termination against father:

1.  Respondent was in jail part or all of the four (4) months just before this petition was filed.

2.  Before going to jail, he has engaged in conduct that exhibits a wanton disregard for the children's welfare.

*See* T.C.A. § 36-l-113(G)(l) and 36-l-102(l)(A)(iv).

The Amended Petition to Transfer Temporary Legal Custody and for Ex Parte Order was filed on July 8, 2011. It alleges extensive illegal drug usage by the mother, and that she was using illegal drugs intravenously in her automobile while the children were present. The father was incarcerated in the federal prison at the time of the petition. The amended petition recites that:

"On 6-27-2011, the temporary custodian, … contacted the Dept. and stated that she could no longer provide care for the children. She feared that she would soon lose her job and the responsibility of caring for the children was getting to be 'too much.'"

The Amended Petition is attached to the Petition to Terminate Parental Rights as Exhibit 1. The adjudicatory hearing was held on February 15, 2012, and the court found that "father admitted to dependency and neglect due to his incarceration until July 2013 based on new charge incurred while in prison."

Father was sentenced in the U.S. District Court for the Eastern District of Texas to 84 months on February 27, 2008 upon being found guilty of conspiracy to possess with intent to distribute cocaine and marijuana. No one testified as to whether father had been incarcerated awaiting his sentencing hearing. Father testified that his prospective release date from prison and a halfway house will be November 11, 2013. He was originally to be released during June 2013, but he assaulted another inmate on December 20, 2011. This extended his release eligibility date and resulted in father being placed in the "hole". The "hole" means that father was segregated away from the general prison population and locked in a cell.

Father wrote a letter to DCS case manager C. Sweet, and told her:

"I beat up a child molester … I'll be in the hole 'till probably the middle of next month, and I11 [sic] be on phone restrictions 'till probably April or May. I wont [sic] be able to call the girls till [sic] then."

Ms. Sweet testified that she sent the Criteria and Procedures for Termination of Parental Rights to father by letter dated March 27, 2012. She also stated in the letter that: "You have not even met Cadince before." Father makes cards and necklaces for the children, sends them to them, and the girls have received them. The foster mother, … said that the girls enjoy receiving the items.

Father has completed several programs while incarcerated. The certificates were admitted as Exhibits 10 through 15. One is a parenting education certificate. Father also said that he had completed anger management training during 2011, but a certificate was not introduced as evidence. He is presently enrolled in programs in which he will receive certificates for hotel/restaurant management, and custodial management.

Ms. Sweet testified that the children send father "colored pages," but they don't remember him. The children have asked her if they have to go back to mom or dad; one of the children mentioned that father burnt the house down. This statement was not explained to the court. The children have talked about mother "shooting up drugs," and were worried when the foster mother began taking medication by injection. Father has complimented the foster mother to her, and he says that he believes the children are doing well.

Heidi Huenergarde, the children's present DCS case manager, testified that the children want to be adopted by their foster parents. They have been in foster care for seventeen months, and their placement has always been with these foster parents. Brooklyn has begun writing her last name as "[the Foster Mom's last name]" and Brooklyn "hollered" to Ms. Huenergarde on December 5, 2012 as she was leaving the permanency planning hearing: "Tell the Judge we want to be adopted." In the case manager's opinion, it is in the best interest of the children to be adopted by these foster parents.

Father's criminal history includes a driving under the influence conviction in 2007. Father stated that there had been domestic violence between him and mother, but he did not say if he had been convicted of domestic violence. He testified that the girls were always home during the domestic violence.

Ms. Huenergarde testified that Erin Story is the children's therapist. The children have never mentioned father in therapy. All have told Ms. Story that they want to be adopted by the foster parents. When the children have phone contact with the father, it is of a short duration, and Brooklyn will say, "Hi, I love you." Bailey will say, "I don't know what to say... hi," and will hand the telephone to Nana (the foster mother).

Father told Ms. Huenergarde that "surrendering (his rights to the children) isn't right; I'm going out fighting."

[The Foster Mom] has been the girls' foster mother the entire time that they have been in foster care. The children do "real good" in her home, and she has a good relationship with them. She and her husband want to adopt the children. She has raised twelve children, and has two biological children. Her two grandsons, ages 8 and 11, stay with her "most of the time." Her grandsons call the girls their sisters.

Although mother has surrendered her rights to the children, [the Foster Mom] permits mother to have supervised visits with the girls.

The girls have short telephone calls with father, but "the baby hasn't talked with him in two months." She talks to father and tells him what is going on in the girls' lives. If she becomes their adoptive mother, she will permit father to visit the girls (the court assumes that it would be supervised visits).

-14-

In her opinion it would break Brooklyn's heart if she had no contact with father, but Brooklyn "would recover."

Father testified via telephone that he believes that he will go to a halfway house during March 2013, and that he will be released during November 2013. His release was originally set for June 2013, but he assaulted an inmate. He plans on living with the children in Texas when he is released. He said that it would be detrimental to his daughters' well-being if they were removed from the care of the foster parents.

The Guardian *ad Litem* stated that father's parental rights should be terminated, and that it is in the children's best interest for his rights to be terminated.

\* \* \*

DCS alleges one ground in its termination petition against father:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child … [and] the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

T.C.A. § 36-l-102(l)(A)(iv). "Wanton disregard" is not specifically defined in the statute. However, wanton disregard has been found as the result of a parent's drug abuse and criminal activity. *In re Audrey S.*, 182 S.W.3d [838] at 867-68 [(Tenn. Ct. App. 2005)].

DCS has shown by clear and convincing evidence in the case at hand that father exhibited a wanton disregard for the children's welfare and safety. In particular, he agreed that he and mother had engaged in domestic violence while the children were at home, and that he was convicted of driving while under the influence in 2007. Father has been incarcerated since at least February 27, 2008, and he is serving an 84 month sentence for conspiracy to possess with intent to distribute cocaine and marijuana. He has thus not seen any of the children for four and one-half years.

DCS must also prove that it is in the best interest of the children for the father's rights to be terminated. The non-exhaustive list of factors that the court may consider are codified in T.C.A. § 36-l-113(i). The court finds that father has not made an adjustment of circumstance or conduct so as to make it safe for his daughters to be in his home; specifically, he has had his release eligibility date extended due to his assault upon an inmate. If one believes father's version of the assault, father took it up [sic] himself to be a vigilante. He says that he has completed an anger management curriculum, but his assaultive acts show that he did not learn from the curriculum. *See factor (1) of the statute.*

The only contact the father has had with the children, factor (3), is telephonic or by mail. The two older children have very brief phone conversations with him, and the youngest child has not spoken with him for more than two months. Moreover, when father was in "the hole" due to his assaultive behavior, he was not permitted to have telephone contact with the children for several months (four or five).

There is no "meaningful" relationship between father and the children. *See factor (4).* He has never seen the youngest child as he has been incarcerated continuously since before her birth. The foster mother believes that Brooklyn would miss the contact (cards, brief calls, and necklaces) but that she would recover. In fact, on the date of this hearing, Brooklyn told Ms. Huenergarde: "Tell the Judge we want to be adopted." If father's rights were not terminated, he might see the children in person five and one-half years since his last visit, and that is if he is released in November 2013. Ms. Sweet testified that the children do not remember him now.

Factor 5 is the effect a change of caretakers and physical environment is likely to have on the children's emotional and psychological condition. These children have been with their foster parents for seventeen months. The foster parents want to adopt the children. Brooklyn has been writing her name as "[the Foster Mom's last name]". All three children see a therapist although no testimony was presented as to why. Father said that he would take the children to live in Texas. The court cannot fathom the effect this move would have on children who have not seen him for five and one-half years.

The court does not know the extent of any physical or emotional abuse perpetrated upon mother as father only said that there had been domestic violence while he lived with mother. Actually, the father did not say he

perpetrated the violence; in any event, there was domestic violence while the children were present. *See factor (6).*

In summary, these children need permanency and stability. The court believes that father is being selfish in not seeing this as he said that "surrendering his rights to the girls isn't right; I'm going out fighting." He even admitted during his testimony that it would be detrimental to his daughters' well-being if they were removed from the foster parents.

\* \* \*

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED as follows:

> 1. The parental rights of the father, [Father], be and the same are hereby FOREVER TERMINATED to the [Children];
>
> 2. Neither parent shall have any relationship, legal or otherwise with the children; nor shall they have the right [to] notice of any proceedings regarding the children's adoption; nor any right to object thereto; ….

(citations omitted). Father appeals the termination of his parental rights to the Children.

### Discussion

Although not stated exactly as such, Father raises two issues on appeal: 1) whether the Juvenile Court erred in finding that clear and convincing evidence had been proven of grounds to terminate his parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv); and, 2) whether the Juvenile Court erred in finding that clear and convincing evidence had been proven that it was in the Children's best interest for his parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by

clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first consider whether the Juvenile Court erred in finding that clear and convincing evidence had been proven of grounds to terminate Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv). As pertinent to this appeal, Tenn. Code Ann. § 36-1-113(g)(1) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2012). In pertinent part, Tenn. Code Ann. § 36-1-102 provides:

> (1)(A) For purposes of terminating the parental or guardianship rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> * * *
>
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; or

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2010).

In its December 19, 2012 judgment the Juvenile Court made detailed and specific findings relative to this issue including:

> DCS has shown by clear and convincing evidence in the case at hand that father exhibited a wanton disregard for the children's welfare and safety. In particular, he agreed that he and mother had engaged in domestic violence

while the children were at home, and that he was convicted of driving while under the influence in 2007. Father has been incarcerated since at least February 27, 2008, and he is serving an 84 month sentence for conspiracy to possess with intent to distribute cocaine and marijuana. He has thus not seen any of the children for four and one-half years.

A careful and thorough review of the record on appeal reveals that the evidence does not preponderate against the Juvenile Court's findings made by clear and convincing evidence that grounds existed to terminate Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv). We affirm the Juvenile Court on this issue.

Next, we consider whether the Juvenile Court erred in finding that clear and convincing evidence had been proven that it was in the Children's best interest for Father's parental rights to be terminated. In its December 19, 2012 judgment the Juvenile Court made detailed and specific findings relative to this issue, as discussed fully above. We need not reiterate these findings or the evidence from the record which supports these findings as we already have discussed them thoroughly. The Juvenile Court clearly considered the non-exclusive list of factors contained in Tenn. Code Ann. § 36-1-113(i), among other appropriate factors, when making its findings under the best interest analysis. The evidence in the record on appeal does not preponderate against the Juvenile Court's findings made by clear and convincing evidence that it is in the Children's best interest for Father's parental rights to be terminated. We affirm the Juvenile Court on this issue.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Nicholas K.S.

_____
D. MICHAEL SWINEY, JUDGE